UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WERUVA INTERNATIONAL, INC., ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> PETS GLOBAL, INC. d/b/a Fussie Cat and Premium Fussie Cat, ) <br><br> Defendant. ) | Civil Action No. 1:12-CV-10447-WGY |

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant Pets Global, Inc. d/b/a Fussie Cat and Premium Fussie Cat ("Pets Global"), by its attorneys, Pierce Atwood LLP, respectfully submits this memorandum of law in opposition to the motion by Plaintiff, Weruva International, Inc. ("Weruva"), for a preliminary injunction. ("Weruva Motion"; Document No. 3.)  Pets Global also submits herewith the Affidavit of Daniel Hereford ("Hereford Aff."), its President.

## INTRODUCTION

The Court has read Weruva's moving papers, in which preliminary injunctive relief of various sorts is sought by a combination of hearsay, hysteria, unsupported allegations and illogical inferences.  To quote Paul Harvey, Pets Global now submits "the rest of the story."

Both Weruva and Pets Global manufacture – in exactly the same facility in Thailand – and distribute a competing line of "human style" cat food.  (Hereford Aff., ¶ 2, 4, 5.)  Weruva, based in Natick, Massachusetts, commenced its operations in 2006.  Pets Global entered this

"unique, ultra-niche"[1] market recently in late 2010.  The most material difference between the parties' products is that a typical small can of Weruva's product sells at retail for $1.25-$1.30, whereas Pets Global's product is typically priced at 89¢, a full 30% less than Weruva's product. (*Id.*, ¶ 20)  Weruva, clearly fearful of legitimate competition from a new market entrant, now turns to the Court House instead of the marketplace in a misguided, ill-conceived and unsupported attempt to maintain its market position and pricing power.

Weruva's motion for preliminary injunction has three fundamental problems, none of which it can overcome.  *First*, Weruva's claims are all based on prior iterations of Fussie Cat labels.  Since its entry into the U.S. market, Pets Global has engaged in a process of voluntarily improving its labels and marketing materials, in part to ensure compliance with the complicated web of federal and state regulations governing pet food.  Well before this lawsuit, Pets Global voluntarily undertook to deal directly with the regulatory authorities to bring its labels into full compliance with both federal and state regulations.  Nonetheless, Weruva curiously seeks to enjoin Pets Global from doing things it is not doing.  Weruva's motion is, at best, moot.

*Second*, Weruva's request for a mandatory recall of all pet food containing any allegedly violative labels does not pass the straight-face test.  A mandatory recall is simply not an appropriate remedy in this case between competitors alleging only pecuniary harm and at this early stage of the litigation.  There is no claim, nor can there be, of any issue of public health or the health of animals.  Weruva seeks an extraordinary and disfavored remedy based solely on its inadmissible and unreliable affidavits.  Courts simply do not issue mandatory recalls under such circumstances.

---

[1] Complaint ¶ 8.

{W3113886.2}

*Third*, Weruva asks this Court to issue an extraordinary remedy on the basis of inadmissible hearsay, unauthenticated documents and photographs, and inadmissible "expert" opinion, all of which the Court should disregard or give minimal weight.[2] Due to the dubious and unreliable nature of Weruva's claims and supporting materials, it is difficult to reach any conclusion other than that Weruva is out to defeat its primary competitor in court, a result it apparently could not secure in the free marketplace.

## FACTS

Pets Global, based in North Hollywood, California, was established in 2010 to manufacture and distribute specialty pet foods in the United States. Hereford Aff., ¶ 2. Pets Global's primary product lines are "Fussie Cat" and "Premium Fussie Cat". *Id.* The parties in this case, as well as a third company, Tiki Cat, comprise the market participants in the niche "human style" cat food industry. *Id.* Both Weruva's and Pets Global's products are processed and packaged in the same manufacturing facility in Thailand, which also produces food for human consumption. *Id.*, ¶¶ 4, 5.

In August 2010, Pets Global made its first shipment of Fussie Cat products to the United States. Pets Global planned to distribute its products initially in California, its headquarters and one of five states that does not regulate pet food labeling. In that first shipment, Pets Global shipped only six containers of product to the U.S. with a label that stated, in small print, "Product of the USA." Hereford Aff., ¶ 7. Pets Global believed it was justified in making this representation because it is an American company. *Id.* After questions were raised concerning that label, Pets Global stopped all further shipments of Fussie Cat and retrieved a number of

---

[2] To address these issues, Pets Global filed a Motion to Strike and/or Disregard Certain Affidavits and Documents Proferred by Plaintiff (Document No. 16) on May 25, 2012, the consideration of which is pending before this Court.

{W3113886.2}

containers of its product which had not yet been released for distribution back to the factory in Thailand for relabeling to state "Made in Thailand." *Id.*

Pets Global made its second shipment of Fussie Cat products to the U.S. in early January, 2011. *Id.*, ¶ 8. Throughout the remainder of 2011, as Pets Global expanded its distribution network, it worked with regulators in 45 states to obtain regulatory approval of its labels. *Id.*, ¶ 9. As a result of this process, Pets Global made some other changes to its labels. For example, it changed a reference to "Prevents Urinary Tract Disease," to "Supports Urinary Tract Health." *Id.* The final iteration of the Fussie Cat label, which Pets Global has used continuously since November 2011, has received written approval from all 45 states that regulate pet food labeling. *Id.*, ¶¶ 9-10. Pets Global's distributors typically turn over their inventory of "Fussie Cat" and receive their next shipment every 30 days and, therefore, with nearly 24 months having passed since the original shipment, it is highly unlikely that there is anything more than a trivial number of the original labeled product available for sale. Indeed, with approximately nine (9) months having passed since Pets Global adopted its current label, it is extremely unlikely that anything but product with the current label are available for sale. *Id.*, ¶ 8.

Pets Global also operates a website of its Fussie Cat brand. *Id.*, ¶ 11. The website contained much of the same information that appeared on the Fussie Cat labels. The website also stated that Fussie Cat products contain no ingredients from China. *Id.* Pets Global's manufacturer in Thailand represented to it that it did not source any ingredients from China. *Id.* As a result of Weruva's allegation that Pets Global's products do contain ingredients from China, Pets Global contacted its manufacturer to confirm its previous representation. *Id.* The manufacturer advised Pets Global that it does, in fact, source several ingredients from China, as

{W3113886.2}

does Weruva. *Id.* Pets Global immediately removed any reference to its products not containing

ingredients from China from its marketing materials and took down its website. *Id.*

## ARGUMENT

Weruva requests two types of injunctive relief: (1) a prohibitory injunction preventing

Pets Global from making allegedly false and misleading claims about its products; and (2) a

mandatory injunction ordering Pets Global to recall any pet food with labels to which Weruva

objects. Weruva erroneously analyzes the two types of injunctive relief together. Because a

mandatory recall is a particularly drastic form of injunction, it requires a separate analysis.

Accordingly, Pets Global first presents the familiar law governing preliminary injunctions and

then considers each type of injunctive relief at issue in this case.

## I.     Preliminary Injunction Standard.

The "authority of the District Court . . . to issue a preliminary injunction should be

sparingly exercised." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency*, 649 F.2d 71,

76 n.7 (1st Cir. 1981). A preliminary injunction is an "extraordinary and drastic remedy that is

never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9

(1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d

26, 32 (1st Cir. 2011))[3]. The purpose of a preliminary injunction is to preserve the status quo, by

"freezing an existing situation" until the trial can be held. *See CMM Cable Rep., Inc. v. Ocean

Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).

Under this Circuit's relatively stringent standard for a preliminary injunction, Weruva

must satisfy four criteria, namely (1) that plaintiff will suffer irreparable injury if the injunction

is not granted; (2) that such injury outweighs any harm which granting injunctive relief would

---

[3] *See also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

{W3\13886.2}

inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and

(4) that the public interest will not be adversely affected by the granting of the injunction. *See*

*Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). When, as

here, the moving party seeks mandatory action by the non-moving party, the burden is elevated

and the injunction "should be granted only in those circumstances when the exigencies of the

situation demand such relief." *Mass. Coal. of Citizens*, 649 F.2d at 76 n.7; *City of Lowell v. Enel*

*N. Am., Inc.*, 705 F. Supp. 2d 116, 120 (D. Mass. 2010) ("mandatory preliminary injunction . . .

carries an elevated burden of proof") (internal quotations omitted).

## II.     Weruva is Not Entitled to Prohibitory Injunctive Relief.

Weruva seeks an injunction prohibiting Pets Global from making certain claims about its

products. Weruva's motion fails because Pets Global voluntarily discontinued the challenged

conduct prior to the commencement of this litigation. Weruva's prohibitory injunction also fails

because it cannot meet its burden under the familiar four-part standard.

### A.   Weruva's Motion Should Be Denied Because Pets Global Voluntarily Ceased the Allegedly Offending Conduct Prior to the Commencement of This Litigation.

Pets Global discontinued the vast majority of the challenged conduct long before Weruva

even filed suit. There is, therefore, nothing "broken" that needs to be "fixed", as Weruva's

motion for prohibitory injunctive relief is moot. In the alternative, it fails because Pets Global's

voluntary cessation of the challenged conduct militates strongly against the issuance of an

injunction.

Article III of the Constitution prohibits federal courts from deciding cases or

controversies that have been rendered moot by subsequent events. *See United States v. Reid*, 369

F.3d 619, 624 (1st Cir. 2004). Under the voluntary cessation doctrine, a dispute is moot when

(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief

or events have completely and irrevocably eradicated the effects of the alleged violation. *See Aroostook Band of Micmacs v. Ryan*, 404 F.3d 48, 70 (1st Cir. 2005), *overruled on other grounds by Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16 (1st Cir. 2006). Stated differently, "behavior certain not to recur ought not be enjoined . . . ." *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 48 (1st Cir. 2010). *See also Adams v. Bowater Inc.*, 313 F.3d 611, 615 (1st Cir. 2002) ("mootness turns primarily on future threats, not upon penance").

Weruva's request for prohibitory injunctive relief is moot because there is no reasonable expectation that the alleged violations will occur in the future. Motivated to comply with state and federal regulations, Pets Global undertook an exhaustive process of redesigning and redrafting its label to receive approval by the all 45 states that regulate in this area. As a result, Pets Global has had a fully approved label since November 2011. Likewise, Pets Global immediately removed any references to China upon discovering that its (and Weruva's) manufacturer obtained a few ingredients used in Fussie Cat from China. Accordingly, Pets Global's voluntary cessation of any of the challenged conduct has eradicated the effects of any alleged violations.

Even if Weruva's motion is not moot, injunctive relief is unnecessary. When a defendant has voluntary discontinued the challenged conduct, the defendant's "good faith is relevant to the question of whether a preliminary injunction should issue" and  preliminary injunctive should not issue when "[t]here is no hint of any proclivity or interest" on the part of the Defendant to engage in the challenged conduct in the future. *See Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 13 (1st Cir. 1986) In *Camel Hair & Cashmere*, the defendant, which was selling mislabeled coats in good faith, ceased the challenged activity voluntarily after plaintiff filed suit. *Id.* at 9. The First Circuit affirmed the denial of a

{W3113886.2}

preliminary injunction prohibiting defendant from selling mislabeled coats finding that "there was no likelihood of [defendant] causing any injury to [plaintiff] at the time the request for an injunction was being considered." *Id.* at 13.

This case is similar to *Camel Hair & Cashmere* except that here, Pets Global voluntarily discontinued the challenged conduct *before* even the threat of litigation. There is thus "no hint of any proclivity or interest" for Pets Global to sell Fussie Cat with noncompliant labels. Weruva's motion for preliminary injunction should be denied on this ground alone.

### B. Weruva is Not Likely to Succeed on the Merits.

Weruva's motion should still also be denied because Weruva is not likely to succeed on the merits of its underlying claims. The *sine qua non* of the four-part inquiry is likelihood of success on the merits; "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). According to Weruva, Pets Global made seven different false statements that violated the Lanham Act and constituted unfair and deceptive trade practices and tortious interference with business relations under Massachusetts law.[4] Weruva Memo. at 2.

---

[4] Weruva analyzes its substantive claims solely under the Lanham Act, 15 U.S.C. § 1125. Weruva Memo, at p. 5-7. Pets Global will do the same. To prove a false advertising claim under the Lanham Act, a plaintiff must demonstrate that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310-11 (1st Cir. 2002).

{W3113886.2}

###### i.      *Unlawful health claims.*

Weruva alleges that Pets Global falsely advertises that its products "prevent urinary tract infection." Weruva Memo. at 7-8. In conclusory fashion, Weruva states that those claims are literally false, without offering any proof of falsity or engaging in any meaningful Lanham Act analysis. Rather, Weruva merely states that Pets Global makes "drug claims governed by the FDA." *Id.* at 8. Weruva's argument is woefully incomplete. Suggesting that the FDA "governs" drug claims is not proof that Pets Global violated the Lanham Act. At the risk of giving Weruva a roadmap, it did not, for example, supply any authority suggesting that the FDA has regulatory authority over Pets Global or what constitutes a "drug claim" or whether such claims are permissible under the Lanham Act. Weruva presents literally no authority demonstrating that Pets Global violated the Lanham Act by stating that its products prevent urinary tract infection. Accordingly, Weruva has not met its burden to demonstrate that it will likely succeed on this claim.

In any event, Pets Global voluntarily removed the statement "prevents urinary tract infection" from its Fussie Cat labels last year. Likewise, Pets Global voluntarily removed any such statements from its website. Currently, some of Pets Global's labels state only that the product "supports urinary tract health." This type of statement is fairly common among cat food manufacturers[5] and has been sanctioned by the FDA[6] as well as approved by various state regulators. Hereford Aff., ¶ 9.

---

[5] *See, e.g.:*

http://www.petsmart.com/family/index.jsp?categoryId=2768975&f=Taxonomy%2FPET%2F2768975&lmdn=Health+Needs&f=PAD%2FAilment%2FUrinary+Tract+Care&fbc=1&fbn=Ailment%7CUrinary+Tract+Care&fbx=0

http://www.petfooddirect.com/Product/7867/Iams-Veterinary-Formula-Urinary-O-Moderate-pH/O-Canned-Cat-Food

{W3113886.2}

###### ii.   *Country of Origin.*

Weruva claims that Pets Global falsely represented the origin of its products. Weruva Memo. at 8-9. First, Weruva contends that Pets Global's labels falsely bear the words "Product of USA" in violation of an FDA regulation. Again, Weruva's argument is missing several links in the logic chain. For example, does a violation of an FDA regulation necessarily result in a Lanham Act violation?[7] Weruva does not address this question. Weruva has not shown that it will likely succeed on this claim. In any event, Pets Global voluntarily changed its label in January 2011 and replaced the challenged statement with "Made in Thailand." Pets Global has not shipped a label containing the challenged statement for over a year and a half. There are very few, if any, of the challenged labels left in the stream of commerce. Hereford Aff., ¶ 8.

Second, Weruva contends that Pets Global falsely states on its marketing materials that its products contain no ingredients from China. However, immediately upon learning that its manufacturer sourced a few harmless ingredients from China, Pets Global immediately removed all references to China from its marketing materials and website. Hereford Aff., ¶ 11.

###### iii.   *Failure to Disclose Menadione Sodium Bisulfate Complex.*

Weruva claims that Pets Global fails to disclose its use of Menadione and instead, refers to it as "Vitamin K3 Supplement" on its Fussie Cat labels. Weruva Memo. at 10-11. Again, Weruva's argument begs more questions than it answers. Weruva acknowledges that Menadione

---

[6] Interpreting Pet Food Labels (http://www.fda.gov/AnimalVeterinary/NewsEvents/FDAVeterinarianNewsletter/ucm090102.htm?utm_campaign= Google2&utm_source=fdaSearch&utm_medium=website&utm_term=) (noting that "CVM is exercising regulatory discretion in not taking action against products that bear claims akin to "reduce urine pH to help maintain urinary tract health").

[7] *See Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 549 F. Supp. 2d 708, 714 (D. Md. 2008) (discussing interplay between FDA regulations and false advertising claims under Lanham Act and noting that "federal courts should not unduly entangle themselves in regulatory agency decisions"). *See also Codonics, Inc. v. DatCard Sys., Inc.*, 2009 WL 2382567 (N.D. Ohio July 31, 2009) (discussing interplay between FDA regulations and false advertising claim).

{W3113886.2}

is approved for use in pet food; in fact, many of Weruva's own cat food products contain Menadione. *Id.* at 10; Hereford Aff., ¶ 16. Weruva suggests that Pets Global violated an FDA regulation by labeling Menadione as "Vitamin K3," which it claims is a prohibited collective (generic) name for Menadione. *Id.* at 11. Weruva, however, fails to substantiate its claim that "Vitamin K3" is a generic name for Menadione. Even if it is, Weruva fails to demonstrate that such a purported violation of an FDA regulation is sufficient to constitute a violation of the Lanham Act. Weruva has not shown that it will likely succeed on this claim. In fact, a review of Weruva's listed ingredients on its own products shows that it also lists certain ingredients as "generic" names, such as "Vitamin D3 Supplement" and "Vitamin B12 Supplement".[8] In any event, Pets Global voluntarily changed its labels in November 2011 and replaced the challenged statement with "Menadione Sodium Bisulfate Complex (Source of Vitamin K3)," substantively the same statement Weruva uses on its labels.

iv.    *Human grade product.*

Weruva claims that Pets Global deceptively markets its products as a human grade product. Weruva Memo. at 11-12. According to Weruva, this violates the Lanham Act. Again, Weruva's argument is fatally incomplete. Weruva does not bother to discuss the complex interplay between pet food regulations and false advertising claims under the Lanham Act. In addition, Weruva itself labels its products as "Made in a Human Food Facility" and "Better Than Human Grade!"[9] This is so despite the fact that Weruva's products also contain many of the same ingredients as are in Pets Global's products that Weruva claims are not edible by humans such as Menadione.[10] In any event, Weruva voluntarily discontinued labeling its products as

---

[8] Weruva website (http://www.weruva.com/cat-cuisine-peking-ducken.php).
[9] Weruva website (http://www.weruva.com/index.php); Hereford Aff., ¶ 5.
[10] Weruva website (http://www.weruva.com/cat-cuisine-asian-fusion.php)

11

"human grade" in November 2011 and all of its Fussie Cat products have a picture of a cat, a feline feeding chart and "PET FOOD ONLY" stamped on the can.  Hereford Aff., ¶¶ 13-14.

<em>v.    Association with established brands.</em>

Weruva claims that Pets Global has associated its tuna with Subway and Starkist brands and represented that its products are the same as Weruva's products, except less expensive. Weruva Memo. at 12-13.  Weruva's entire claim is based on inadmissible hearsay or unauthenticated documents, all of which the Court should disregard or afford no weight.[11]  None of the allegations are true.  Hereford Aff., ¶¶ 14, 24, 25.  Pets Global did not, and does not, associate its products or the ingredients in its products with the products of other manufacturers.

<em>vi.    Moisture content.</em>

Weruva claims that some of Pets Global's products have a moisture content that exceeds the content permitted by various state regulations.  Weruva Memo. at 13-14.  The applicable regulation, which is based on an Association of American Feed Control Officials (AAFCO) model regulation adopted by many states, provides that:

> The maximum moisture in all pet foods shall be guaranteed and shall not exceed 78.00% or the natural moisture content of the constituent ingredients of the product, whichever is greater.  Pet foods such as those consisting principally of stew, gravy, sauce, broth, juice or a milk replacer which are so labeled, may contain moisture in excess of 78.00%.

*See* Massachusetts' Pet Food Regulations, 330 CMR 13.06(1).  Thus, pet foods can contain more than 78% moisture content only if: (1) the natural moisture content of the constituent ingredients of the product exceeds 78%; or (2) the product consists principally of stew, gravy, sauce, broth, juice or a milk replacer, which is so labeled.

---

[11] Pets Global hereby incorporates by reference its Memorandum in Support of Pets Global's Motion to Strike (Document No. 17), which discusses these issues in detail.

{W3113886.2}

All Pets Global products with moisture content greater than 78.0% clearly state that they are "in gravy" or "in aspic", or words to that effect and, in any event, the moisture content of Weruva's products is even higher. Hereford Aff., ¶¶ 22-23. Accordingly, Weruva's claim here fails on the merits.

vii.     *Failure to comply with labeling regulations.*

Weruva claims that Pets Global displays the net quantity of its products in violation of state and federal regulations. Weruva Memo. at 14-15. Weruva's primary contention is that Pets Global does not place the net quantity statement on the "principal display panel" of the label. According to Weruva, the net quantity statement appears "on the rear" of Fussie Cat labels. *Id.* at 15. Both state and federal regulations require that the net quantity statement appear on the "principal display panel," defined as "the part of a label that is most likely to be displayed, presented, shown, or examined under customary conditions of display for retail sale." *See* 21 C.F.R. § 501.1; 330 CMR 13.01. Likewise, Weruva claims that Pets Global's Fussie Cat labels violate various other state regulations in a variety of ways. All 46 states that regulate pet food have approved Pets Global's labels. According to these regulatory bodies, Pets Global's labels are compliant with the applicable regulations. Weruva's claims here are simply false.

**C.     Weruva Will Not Suffer Irreparable Injury If This Injunction Is Denied.**

Weruva has the burden to prove that it will suffer irreparable injury if the injunction is not granted.[12] Irreparable injury in the preliminary injunction context "means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The irreparable injury prong has two

---

[12] Weruva appears to erroneously conflate the irreparable injury requirement for a preliminary injunction and the likelihood of harm requirement of a substantive Lanham Act claim. *See* Weruva Memo. at 17 (discussing "substantial likelihood of harm" and "likelihood of injury").

13

{W3113886.2}

components, both of which Weruva has failed to demonstrate:  Weruva must prove: (1) that it

will suffer injury *if the injunction is denied*; and (2) that its injury is irreparable.

*First*, Weruva cannot prove that it will suffer injury *if the injunction is denied*.  *See*

*Planned Parenthood*, 641 F.2d at 1009.  Whether the Court grants or denies Weruva's motion,

Weruva's alleged injuries will remain the same as they are today.  Pets Global voluntarily

discontinued the challenged conduct prior to this litigation and its products are approved for sale

in all 45 states that regulate in this area.  *See Creative Labs, Inc. v. Mad Dog Multimedia, Inc.*,

2002 WL 32068970, at *3 (N.D. Cal. Oct. 3, 2002) (denying preliminary injunction in false

advertising claim, in part, because plaintiff could not show irreparable harm when "defendant

has undertaken to stop using the [challenged trademark] and to change its packaging" and there

was little offending product in the stream of commerce).

*Second*, Weruva's injuries, if any, are compensable.  If Weruva proves that Pets Global

engaged in false advertising, its remedy would be damages for demonstrable harm, if any, to its

business.  In fact, Weruva does not even assert, at any point in its memorandum, that its alleged

injuries are irreparable.[13]  *See Hill's Pet Nutrition*, 258 F. Supp. 2d at 1206 (specialty dog food

manufacturer failed to prove irreparable harm in false advertising competitor suit when there was

"[n]o evidence . . . that plaintiff suffered any intangible harm, such as damage to reputation or

---

[13] Weruva principally relies on the First Circuit's decision in *Camel Hair & Cashmere*, 799 F.2d 6 (1st Cir. 1986).
The issue in that case was whether a non-profit coalition of camel hair and cashmere manufacturers and marketers
was irreparably injured by a department store that sold cashmere products containing labels that overstated the
products' cashmere content.  The court held that the non-profit coalition did show irreparable injury, basing its
holding on two factors.  First, the court found that the circulation of counterfeit or inferior products damaged the
reputation of the commodity and plaintiff's interest in the commodity.  *Id.* at 15.  Second, the court found that
injunctive relief was warranted because defendant's labels were objectively false and plaintiffs had an interest in
eradicating such falsity.  *Id.* at 15-16.  Here, Pets Global's alleged false advertising does not damage the reputation
of human style cat food nor of Weruva's interest in the niche market.  Likewise, Weruva failed to prove that Pets
Global is making objectively false statements.

14

loss of goodwill, or tangible harms, such as business loss . . . [and] any damage to plaintiff could be remedied by mere money damages").

### D. The Remaining Factors Militate in Favor of Denying Injunctive Relief.

Weruva also has the burden to prove that its injury outweighs any harm that granting injunctive relief would inflict on Pets Global and that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood*, 641 F.2d at 1009. Because Weruva cannot prove the first two factors, extensive discussion here is not necessary. Neither of these factors weigh in Weruva's favor.

Weruva has no ongoing injury because Pets Global discontinued the challenged conduct before the litigation. An injunction against Pets Global, Weruva's primary competitor in an ultra-niche market, would harm Pets Global's reputation and business substantially. Hereford Aff., ¶ 26. Weruva's injury does not outweigh any harm that granting injunctive relief would inflict on Pets Global. Likewise, by curtailing competition in an ultra-niche market, the public interest could be adversely affected by an injunction against Pets Global. Under these circumstances, the issuance of an injunction would be anti-competitive and harmful to the human style cat food market's consumers.

### III. Weruva's Request For a Mandatory Recall is Inappropriate and Should be Rejected.

Weruva also seeks a mandatory recall compelling Pets Global to "remove from distribution and store shelves any pet food containing . . . false, or otherwise unlawful, representations on the labels." Weruva's extraordinary request for a recall should be rejected. Initially, the issuance of recall orders, which are extremely burdensome and expensive, at the preliminary injunction stage is strongly disfavored. *See Kompan A.S. v. Park Structures, Inc.*, 890 F. Supp. 1167, 1183 (N.D.N.Y. 1995) (denying request for recall at preliminary injunction

stage because "[r]ecall is a drastic remedy that may impose a substantial burden on defendants . .

. [and] it can be an appropriate remedy within the discretion of the district court *at least in the*

*context of a permanent injunction*") (emphasis added). *See also* 87 C.J.S. Trademarks § 361

("[a] recall is a drastic remedy in a [Lanham Act case] that may impose a substantial burden on a

defendant, but may be an appropriate remedy within the discretion of the court, *in the context of*

*a permanent injunction*") (emphasis added).

A preliminary injunction seeking a recall of infringing products "goes beyond restoring

the *status quo* and is a mandatory injunction that requires additional reasons to justify it."  5 J.

Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 30:50 (4th ed.).  In the

First Circuit, the burden on a party seeking a mandatory injunction is elevated. *Mass. Coal.*, 649

F.2d at 76 n.7.  The elevated burden for a mandatory recall requires plaintiff to demonstrate not

only that the four familiar preliminary injunction factors weigh in its favor, but also that three

additional factors heavily weigh in its favor: (1) willful or intentional conduct by the defendant;

(2) whether the risk of confusion to the public and injury to the plaintiff is greater than the

burden of the recall to the defendant; and (3) substantial risk of danger to the public due to the

defendant's unlawful activity. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,

571 F.3d 873, 879 (9th Cir. 2009); *Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 233 (3d Cir.

2003) (affirming denial of motion for preliminary injunction seeking product recall).[14]  Weruva

has not even come close to introducing admissible evidence to support any of these additional

requirements. *See Hill's Pet Nutrition, Inc. v. Nutro Products, Inc.*, 258 F. Supp. 2d 1197, 1212

(D. Kan. 2003) (denying request for mandatory recall at preliminary injunction stage of false

---

[14] Likewise, in the Second Circuit, "[a] court ordering recall must first weigh the likely burden and expense of a recall." *Kompan*, 890 F. Supp. at 1184. *See also Accusoft Corp. v. Quest Diagnostics, Inc.*, 2012 WL 1358662, at *9 (D. Mass. Apr. 18, 2012) (at preliminary injunction stage, a "recall on this scale would impose heavy and unnecessary costs on [defendant] and its customers").

{W3113886.2}

advertising competitor suit between specialty dog food producers because plaintiff failed to meet its heavy burden to justify a mandatory injunction and, "[a]t this point, no judicial interference in the marketplace is warranted").

In balancing the potential hardships caused by a recall, courts also consider the amount of product subject to the recall order. *See Bausch & Lomb Inc. v. Nevitt Sales Corp.*, 810 F. Supp. 466, 478 (W.D.N.Y. 1993) (denying preliminary injunction seeking mandatory recall of offending products because "the record is incomplete and contains conflicting evidence concerning the number of [offending] sunglasses currently in the marketplace . . . [and] it is impossible to properly balance the competing hardships caused by the granting or denial of a recall order"). For example, one court refused to issue a recall in the face of evidence that defendants had sold relatively few cylinders infringing plaintiff's trade dress and that defendant's customers had turned over their inventory a number of times. *Irwin Indus. Tool Co. v. Worthington Cylinders Wisc., LLC*, 747 F. Supp. 2d 568, 582-83 (W.D.N.C. 2010). Accordingly, the recall "would place a substantial burden on [defendant] and its customers, due to the fact that a recall would be highly unlikely to result in the recovery of any infringing cylinders" and would "likely to be a futile search of every store and distribution center for infringing cylinders." *Id.* at 582, 583. The court concluded that the hardship placed on defendant and its customers outweighed any harm that plaintiff may suffer in the absence of a mandatory recall of any infringing cylinders. *Id.* at 583.

A recall compelling Pets Global to "remove from distribution and store shelves any pet food containing . . . false, or otherwise unlawful, representations on the labels" is not appropriate, particularly at this early stage of the litigation. *First*, mandatory injunctions are only appropriate when the "exigencies of the situation demand such relief." *Mass. Coal.*, 649 F.2d at

76 n.7. Weruva points to nothing urgent or exigent demanding a recall. The parties have been competing in the same niche industry for nearly two years. Weruva, however, did not rush to the Court House seeking emergency relief. Weruva's own papers demonstrate that it was aware of Pets Global's marketing activities as early as March 2011. *See* Affidavit of Ward Reynolds, ¶ 3 (Document No. 10.) Weruva, having waited over a year, cannot now say that the situation is urgent, particularly when the dispute is between two commercial competitors and the potential harm at issue is merely pecuniary. Notably, this is not a case where the public safety is at stake, which may actually justify such emergent relief.[15] In fact, Weruva makes no allegations that Pets Global's cat food products pose any health or safety threat to animals or humans. The parties' food is produced in the same manufacturing facility using many of the same ingredients. Accordingly, a mandatory recall is not appropriate because there is no urgent need.

*Second*, courts must weigh the burden and expense of a recall. Here, the burden of the recall to Pets Global would greatly exceed the risk of confusion to the public and pecuniary injury to Weruva. Hereford Aff., ¶ 26. The burden on and expense to Pets Global would be enormous. Given that Pets Global's labels have been fully compliant with regulations for nearly a year, and that Pet Global's distributors turn over the product approximately every 45 days, there is very little, if any, allegedly offending product left on the shelves. Moreover, Pets Global sells products to distributors, who in turn sell products to the public. Accordingly, the recall "would place a substantial burden on [Pets Global] and its customers, due to the fact that a recall would be highly unlikely to result in the recovery of any infringing [cat food]" and would "likely

---

[15] *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 479 F. Supp. 2d 968, 994 (N.D. Iowa 2007) (denying preliminary injunction seeking recall in false advertising competitor suit because there was no evidence of "any harm to the public, the livestock industry, or the meat processing industry, . . . [which] demonstrates that there is presently no public health risk requiring a recall"); *Playskool, Inc. v. Prod. Dev. Group, Inc.*, 699 F. Supp. 1056, 1063 (E.D.N.Y. 1988) (issuing recall because "the misleading language on defendant's packaging creates a potential safety hazard for children" and "the public safety is at stake").

{W3113886.2}

to be a futile search of every store and distribution center for infringing [cans]." *Irwin Indus. Tool*, 747 F. Supp. 2d at 582, 83.  Likewise, a recall would "irreparably harm [Pets Global's] reputation in the [cat food] industry." *Larami Corp. v. Lanard Toys Ltd.*, 1992 WL 20320, at *1-2 (E.D. Pa. Jan. 30, 1992) (reversing recall order in patent infringement action because it "was premature at the preliminary injunction stage" and defendant would not sell many infringing products in the future and recall would irreparably harm defendant's reputation).

Finally, the alleged harm to Weruva is close to non-existent, even on the "evidence" proferred by it.  The alleged harm in this case is that Pets Global's purportedly false labels give it an unfair advantage over Weruva.  Weruva's claims are speculative at best but do not implicate anything more than a pecuniary harm.  The public safety is simply not at stake.  There is, simply put, nothing to justify placing this substantial burden on Pets Global.

*Third*, the procedural posture of this case militates against issuing a mandatory recall. Recall orders are unique and disfavored, particularly at the preliminary injunction stage.  The reason is self-evident – courts should not issue such a burdensome remedy without a full consideration of the facts, unless the public safety demands it.  The parties have not engaged in any discovery and the record is minimal, consisting of Weruva's inadmissible and unreliable affidavits supporting its motion for preliminary injunction.  Weruva does not offer evidence, for example, of how many allegedly offending cans of Fussie Cat were placed into the stream of commerce and when.  *See Bausch & Lomb*, 810 F. Supp. at 478 (denying preliminary injunction seeking recall of offending products because "the record is incomplete and contains conflicting evidence concerning the number of [offending] sunglasses currently in the marketplace . . . [and] it is impossible to properly balance the competing hardships caused by the granting or denial of a

{W3113886.2}

recall order"). Accordingly, "[a]t this point, no judicial interference in the marketplace is warranted." *Hill's Pet Nutrition*, 258 F. Supp. 2d at 1212.

## CONCLUSION

For the foregoing reasons, the Court should deny the Weruva Motion. In the alternative, if the Court does not deny the Weruva Motion, Pets Global request that the Court set an expedited discovery schedule and, pursuant to Fed. R. Civ. P. 65(a)(2), advance the trial on the merits and consolidate it with an evidentiary hearing on the Weruva Motion in September, 2012, or as soon thereafter as is convenient for the Court. Finally, in the event the Court considers injunctive relief at this early stage, Pets Global requests a hearing to determine, pursuant to Fed. R. Civ. P. 65(c), the security to be provided by Weruva to pay the costs and damages sustained by Pets Global.

Dated: June 15, 2012

Respectfully submitted,

PETS GLOBAL, INC.

By its attorneys,

/s/ Larry L. Varn
Larry L. Varn (BBO #508130)
lvarn@pierceatwood.com
Jeffrey E. Francis (BBO #639944)
jfrancis@pierceatwood.com
PIERCE ATWOOD LLP
100 Summer Street, Suite 2250
Boston, MA  02110
Telephone: (617) 488-8100
Facsimile: (617) 824-2020

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of June, 2012, I electronically filed the above-document and that such document is available for viewing and downloading from the court's ECF system.  Service on counsel of record has been effectuated by electronic means.

/s/ Larry L. Varn

{W3113886.2}